THE FIRST NATIONAL BANK OF WATERLOO

*v.*

MYRTIE S. BENNETT.

*Opinion filed April 17, 1905—Rehearing denied June 8, 1905.*

1. EVIDENCE—*when declarations of deceased person are admissible.* Admissions and declarations of a deceased person against his interest, tending to show delivery of a note intended as collateral security for money received by him from his mother for investment, are admissible in evidence, as against his wife, in a suit wherein she defends as devisee and legatee of the husband.

2. SAME—*when principles governing gifts causa mortis do not apply.* The principles governing gifts *causa mortis,* or testamentary dispositions of property, or the relation of principal and agent, do not apply to a transaction whereby a son, in expectation of death, places in the custody of a third person collateral previously set apart by him as security for money received by him from his mother for investment, even though the custodian was to return the collateral to the son in case of his recovery.

APPEAL from the Appellate Court for the First District;— heard in that court on writ of error to the Circuit Court of Cook county; the Hon. E. F. DUNNE, Judge, presiding.

ASHCRAFT & ASHCRAFT, (E. M. ASHCRAFT, of counsel,) for appellant.

A. C. NOBLE, (GEORGE H. MASON, and VINCENT D. WYMAN, of counsel,) for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This was a bill in chancery filed by the appellant bank in the circuit court of Cook county praying for the foreclosure of a trust deed executed by the appellee and her husband, John C. Bennett, now deceased, whereby the premises known as 418 Warren avenue, in the city of Chicago, were mortgaged to secure a note executed by the appellee, payable to her own order and by her endorsed in blank, and, as the bill alleges, delivered to one Eliza V. Bennett and now owned by the appellant. In the circuit court a decree was entered on the hearing awarding foreclosure of the mortgage as prayed in the bill and denying the prayer of a cross-bill filed by appellee asking that the note and mortgage be ordered delivered up to her. The Appellate Court for the First District, on a writ of error, reversed the decree of the circuit court and remanded the cause, with directions to dismiss the original bill. Thereupon the bank perfected this appeal to this court.

The appellee admitted that she had signed the note and endorsed it in blank and that she had executed and acknowledged the mortgage. The defenses sought to be maintained to the bill were, (1) that she did not deliver the note to any-one, and that it therefore never became a binding, legal obligation; (2) that there was no consideration for the note; and (3) that the claim of Eliza V. Bennett to the note is based on an alleged transfer and delivery to her by said John C. Bennett, deceased, and that there was no valid and effectual delivery by him to said Eliza V. Bennett. The appellee also filed a cross-bill.

Said Eliza V. Bennett was the mother of said John C. Bennett, now deceased, who was the husband of the appellee. He left a will making appellee sole legatee and devisee. In September, 1899, the said John C. Bennett, who lived in Chicago, visited his mother, who resided in Waterloo, Iowa, and while there received a large sum of money from her, for

which he gave to her his note in the sum of $7142.86, payable eleven years after date, bearing seven per cent interest. He was to give her security or collateral of some nature or make investment of the money for her when he returned to his home in Chicago. The transaction was mainly intended to enable him to find safe investment for his mother's money. On the 28th day of October of the same year the said John C. Bennett was taken violently ill with typhoid fever, and he died on the 24th day of November of that year. On the first day of October, 1899, after his return to his home in Chicago, the note on which the decree of foreclosure is here sought was signed by the appellee, and on the same day the appellee and her husband signed the trust deed given to secure it. The trust deed was not, however, acknowledged until October 19, 1899. The husband, in July, 1899, had purchased from the Chicago Title and Trust Company a note given by Sarah J. Giles and George Giles, secured by a mortgage on property known as No. 418 Warren avenue, Chicago. He filed a bill in his own name to foreclose this mortgage, and a settlement was effected between him and the Gileses which resulted in the conveyance of the property to the appellee, with an agreement by which the Gileses could obtain a re-conveyance on payment of the sum of $2850 on or before October 1, 1900. The agreement further provided that the appellee should be authorized to put an encumbrance on the Giles property for any sum less than $2850, for a period not to exceed five years and bearing interest at a rate not exceeding seven per cent. The theory of appellant is, that under this agreement the note and mortgage here sought to be foreclosed were executed by the appellee, and the note was delivered to the said John C. Bennett in order that the said John C. Bennett, who had caused the Giles property to be put in the name of the appellee, Myrtie Bennett, his wife, might apply the note and trust deed so given by his wife on the Giles property for the purpose of securing his mother for so much of the money which he had received from her.

The evidence bearing on the issue that the notes had never passed out of the possession of the appellee and had not become a binding obligation against her was, in substance, as follows:

The appellee testified that she arranged with one Mr. Dahl to draw the note and trust deed. Mr. Dahl testified that John C. Bennett requested him to draw the note and mortgage, and that to the best of his recollection he had no conversation with Mrs. Bennett with reference to preparing the instruments. The appellee testified that her recollection was that she did not sign the notes at Mr. Dahl's office, but that she took them away with her unsigned and signed them afterwards, and that she kept the notes in her possession. She further testified: "I don't think that anyone ever saw the notes,—not even the doctor [her husband] saw them after I signed them. I kept them with me a good deal of the time, like I generally do when I am doing business. I don't think I kept them with me all the time. I had them in the vault, in a box, with my other papers,—I think in a vault in my office. I had a box in Snow & Son's vault. I deposited these notes in that box." On cross-examination she said: "I referred to this $2500 note that nobody had seen since it was signed but myself. My husband never had it. The trust deed I left with Mr. Dahl and took the notes away. I had the notes in my shopping bag with my papers on the day I rented the vault. I don't know how long they had been there. I cannot tell whether they were there or in the vault. I think perhaps that they were down town at that time. I had the combination of my husband's vault. I cannot tell whether I was in the office the day I rented the vault or not. I went there every afternoon. I presume I carried the notes around from the day of the execution of the trust deed until I placed them in the safety deposit vault. I cannot tell whether I ever put them in the vault or not or whether I kept them with me. I don't think the notes were in my husband's office when he took sick. After he got sick I took

215    26

them. I had them with me, and going back and forth so much and being away from the house, I think I took them. I had a tin box at home that I kept my papers in, under the head of my bed. At that time I was in the habit of keeping my papers with me and the tin box was with me at night. At the time my husband took sick I was in the habit of keeping my papers in the tin box under my bed at night and taking them out in the morning when I was going to be away. After he got sick, being obliged to be at the office, I am not sure whether I kept them in the vault or not. It is my impression they were never in the vault. I think on the day my husband took sick this note was not in the vault. Dr. Bennett had a box in the vault which he kept his papers in. When he took sick it was in the vault and I had a key to it. I opened it while he was sick."

Mr. Dahl testified: "The notes were made and executed at the time and were delivered to John C. Bennett and taken away by him. Those are the signatures of Mrs. Bennett on the notes and her endorsement." The positive character of this statement was somewhat weakened by his cross-examination, but only to the extent that it was his recollection and impression that the notes were delivered to John C. Bennett.

Mrs. Ella Lowe, a cousin of John C. Bennett, a school teacher, and who was living in the family of said John C. Bennett during his illness, testified that she heard John C. Bennett tell the appellee, his wife, to bring him some papers from the safety deposit vault in the Unity building; that she went, and after her return she saw the appellee and her husband looking over some papers; that these papers were afterward placed in the possession of the witness under instructions from John C. Bennett which will hereafter be referred to; that among them was the note secured by the mortgage here sought to be foreclosed; that the appellee and John C. Bennett, her husband, in her presence, both told the witness that one of the papers was the note secured by the mortgage here involved.

Donna M. Parker, a sister of John C. Bennett, testified that the appellee told her that $2500 of the money which John C. Bennett owed to his mother was secured on a piece of her (appellee's) property.

The appellee did not at any time give any rational explanation for the execution of the note or the trust deed here sought to be foreclosed or why the same had been endorsed or assigned by her. Her testimony with relation to the possession of the $2500 note executed by her (the one here in suit) was, within itself, so contradictory as to be wholly lacking in convincing power. She was directly contradicted on the point by the testimony of Mr. Dahl, and her testimony bearing upon the contention that there was no consideration for the note was so directly contradicted and so clearly overcome by other testimony on material points, as hereinafter set forth, that the chancellor was justified in attaching but little weight to it. The chancellor was correct in the view that the note given by the appellee and assigned in blank was delivered to her husband, said John C. Bennett.

In order to support her contention that there was no consideration for the note and the mortgage given by her, and to avoid the assertion that they were given because her husband had caused the title to the mortgaged property to be placed in her name, appellee sought to claim that the money to secure which Giles had given the mortgage which her husband had filed the bill to foreclose was her money and that she held possession of the Giles note and mortgage as her own property, and she was therefore entitled to become the owner of that property when her husband adjusted the matter with the Gileses, and procured the title to be conveyed to her. She testified that the money which was loaned to Giles, and for which the mortgage was given by Giles in 1897, was her money, and that it came to her from her father's death; that she was then a small child; that her father died more than thirty years ago; that she had never had a guardian and that she received the money from her mother. She fur-

ther stated that she had possession of the Giles note and mortgage all the time; that she took the papers when they were executed, in 1897, and kept them, and had them when the bill to foreclose was filed by her husband. Chester C. Brownell, manager of the guaranty department of the Chicago Title and Trust Company, testified that the Giles note and mortgage were made direct to the Chicago Title and Trust Company in 1897, and that that company paid the amount loaned to Giles out of its own funds, and held the note and mortgage until January 11, 1898, in its general trust fund, and on that date sold it to the trust fund of Milton P. Carr, a minor, of whom the company was guardian; that the note and mortgage remained in the possession of the trust company until the 7th day of July, 1899, when the company received the money therefor, from whom this witness did not know. David B. Lyman, president of the Chicago Title and Trust Company, testified that the company loaned the money to Giles out of the surplus trust funds; that John C. Bennett recommended the loan to the company, · and that default being made in the second payment of interest, he, the witness, notified John C. Bennett that the loan had not proven satisfactory, and that Bennett then promised to take the loan from the company as soon as he received some money which he was expecting; that a few weeks afterwards John C. Bennett came in and paid the principal and interest on the loan, and that the Giles note and mortgage, which until that time had been in the possession of the company, was on June 7, 1899, assigned and delivered to the said John C. Bennett. This testimony leaves it well proven that it was not the money of appellee which was loaned to Giles, and establishes that she had no ownership of the Giles property other than such as she had by reason of the deed which her husband procured to be made to her when he adjusted the foreclosure suit against Giles.

The presumption that the note and mortgage given by appellee rested upon a sufficient consideration would arise

and prevail unless overcome by countervailing testimony. The appellee did not state any facts other than her claim that it was her money which had been loaned to Giles, which was so clearly disproved, upon which to base a finding that there was no consideration to support her note and mortgage. Her statements otherwise were nothing more, in substance, than that the execution of the instruments was a mere idle form, without any intent or object. We think the only conclusion to be drawn from the testimony on this point is, that she executed the notes and trust deed for the reason that her husband had caused the title to the Giles property to be placed in her name with the agreement that Giles might redeem within one year, and that within that time a mortgage, not exceeding $2850, might be placed upon the property, the amount therefor to be deducted in case Giles desired to repurchase under the agreement, and that the notes were executed by the appellee, endorsed by her and delivered to the husband, to be used as security for or as an investment of money which he had received from his mother.

There remains for determination the contention that there was no valid and effectual delivery of the note here in suit from John C. Bennett, deceased, to his mother. On this contention the appellee's standing as a defendant is as a legatee and devisee of said John C. Bennett, deceased. The admissions and declarations of said deceased made against his interest were on this issue admissible in evidence against her. (2 Wigmore on Evidence, 1080.)

The mortgage executed by the appellee and her husband, here sought to be foreclosed, was acknowledged by them on the 19th day of October, 1899. On the next day, October 20, 1899, John C. Bennett, deceased, wrote Eliza V. Bennett, his mother, as follows: "As to your interest, I have arranged to give you as collateral a $2500 first mortgage bond and coupons on No. 418 Warren avenue, and this with the Chicago Title and Trust Company's guarantee that it is a first lien thereon, and it draws seven per cent interest, due

in five years. This is cashable any day and is worth more than its face. It is not for sale. Yesterday I bought in your name a judgment against No. 420 Warren avenue for $1800, first lien, which gives me control of that place. This makes $4300. You have $200 plus $10 I will charge against you on the balance due you on book account. The remainder will in due time be equally well placed for your safety. It will take a few days for the abstract company to get it in proper shape, so I shall not send them, possibly, until you come to Peoria. It will require care or risk in sending such through the mail. Now, don't worry, and if not satisfied that your interest will be properly protected, come here and see." On the 28th day of the same month John C. Bennett was taken violently ill of typhoid fever, and died on the 24th day of November, 1899.

Ella Lowe, a relative of the deceased, hereinbefore mentioned, testified that the deceased, during his illness and while he was confined to his bed, directed appellee to bring some papers from his safety deposit vault in the Unity building; that appellee went down into the city, and after she returned the witness saw her and her husband looking over some papers together, and that the husband, in the presence of the appellee, gave the papers to the witness and told her to rent a safety deposit box and deposit the papers therein, and said to her: "If I die, hand them to my mother if she will accept five per cent interest; if not, return them to Mrs. Bennett, (Myrtie,) and let her (my mother) get what she can;" that he gave her $1.50 to pay the charges on the box for six months, and insisted that the box should be rented in her name. The witness did not read the papers, but testified that both John C. Bennett and the appellee told her that the note secured on the Giles property was among them. The witness testified she put the papers in her trunk and kept them there two or three days; that the appellee went with the witness to hire the box in the safety vault, and that the papers were locked in the box and the keys given to the wit-

ness, but the box was rented in the name of the appellee.
The witness returned to the house of said John C. Bennett
and locked the keys in her trunk, and testified that at the re-
quest of the appellee the witness did not tell said John C.
Bennett that the box was rented in the name of the appellee.

Donna M. Parker, a sister of said John C. Bennett, sub-
sequently came and remained for some days with her brother.
She testified that she came into the sick room on one occasion
when the sick man was talking with Dr. Merrill, and then
testified that the brother, when he saw her, said: "Dr. Mer-
rill, there is the girl, (referring to the witness) ; I want you
to put the papers in her possession; I want you to put that
box in her name." The witness further testified as follows:
"Dr. Merrill was present, and Mrs. Bennett. She followed
me right into the room. She was there at the time. When I
went into the room Dr. Merrill was standing near the foot of
the bed. Mrs. Bennett followed me in and was in as soon as
I was. The minute John saw me, before I had a chance to
say anything to him, he said, 'There is the girl; put that box
in her name,' and I immediately said, 'John, don't do any-
thing more about that business until you get well, then fix it
to suit yourself.' He says, 'There is no use of talking to me;
I will not be quiet until Dr. Merrill comes back and tells me
the box is in your name and in your possession.' Myrtie
Bennett was standing at one side of the bed and I was stand-
ing on the other, and my brother was a little up on his elbow.
He pointed his finger at Myrtie Bennett and said, 'Donna, she
wants to get those papers in her possession,' and says, 'Now
go with Ella Lowe and Dr. Merrill and get those papers put
in your name, and Dr. Merrill come back and tell me that it
is done.' " This witness further testified that Ella Lowe de-
livered to her the keys to the safety vault and that she and
appellee went together and had the box changed to the name
of the witness, the witness promising the appellee that she
would not deliver the papers in the box to any third party
without the knowledge of the appellee. After the funeral of

John C. Bennett, this witness, the appellee and Dr. Garrett Bennett, a brother of the deceased man, went together to the safety vaults and looked over the papers. The note here involved in this suit was among the papers in the box.

Dr. Henry M. Merrill testified that he heard the deceased man direct that the papers should be placed in the custody of Donna M. Parker; that the appellee suggested to him (the witness) that the box should remain in her name and that the sick man should be led to believe that the box had been changed to the name of Donna M. Parker; that the witness was requested by the deceased to go with the appellee and Mrs. Parker to the vault and come back and assure him that the box had been changed to the name of Donna M. Parker; that the witness did go with the appellee and Mrs. Parker to the vault, saw that the change was made, and went back and told the deceased that the change had been made.

Eliza V. Bennett accepted the conditions upon which she was to receive the papers, and they were turned over to her representative in the presence of the appellee. There is a conflict in the testimony as to whether the appellee consented that this should be done, but that, we·think, to be unimportant. The evidence showed clearly that the deceased man had set the assignment of the judgment, the certificates of deposit and the note here in suit apart, and held them in his custody as collateral security for or as investments of the money which he had received from his mother, and that, believing his death to be imminent, he caused them to be placed in the custody first of Ella Lowe, and later changed the custody to his sister, Mrs. Parker. His design was that if he should die the status of these papers as collateral security. for or as investments of his mother's money should not be changed. The principles governing gifts *causa mortis* or testamentary dispositions of.property, or the relation of principal and agent, are in nowise involved in or applicable to the transaction. The hypothecation of the note as collateral security for or selecting it as. an .investment of his mother's

money was not a gift or in the nature of a bequest or legacy. If he survived the attack he expected to continue to supervise the affairs of his mother and remain the custodian of her securities or investment until, as he said in the letter, he should see her. His anxiety was for the safety of these securities in case he should die, and that moved him to select another custodian for them in whom he had confidence and by whom he believed that the securities would be safely kept for and delivered to his mother. The condition that if he recovered the custodian should re-deliver them to him had no effect to render the transaction an attempted testamentary disposition of his property, and as such void for want of compliance with the statute regulating the legal execution of wills. If re-delivered to him he would hold the securities in the same capacity in which he held them prior to the selection of another custodian, namely, as a custodian of securities for or investment of the money he had received from his mother.

It is urged in the brief of counsel for the appellee that it appeared in the testimony that said John C. Bennett, deceased, was mentally incapable of transacting business at the time when he directed that the securities or investments be placed in the possession first of Ella Lowe and later of his sister, Mrs. Parker. The pleadings did not present this issue, and, moreover, there was no proof to support it beyond the fact that he was, at times, delirious by reason of fever or on account of weakness produced by hemorrhages. All of the witnesses agree he had lucid intervals. That he was entirely rational when engaged in giving directions as to the change in the custodian of the note here in suit and the other securities or investments intended for his mother is too clear to be questioned.

The judgment of the Appellate Court must be and is reversed and the decree of the circuit court is affirmed.

*Judgment reversed.*